**Craig Charles CLAPPIER,
Plaintiff-Appellee,**

v.

**Dennis FLYNN, Sheriff of Laramie County, Wyoming, Individually and in his representative capacity, Defendant-Appellant.**

**No. 78–1109.**

United States Court of Appeals,
Tenth Circuit.

Submitted May 15, 1979.

Decided Sept. 4, 1979.

Douglas G. Madison, of Dray & Madison, P.C., Cheyenne, Wyo., for plaintiff-appellee.

Glenn Parker, of Hirst & Applegate, Cheyenne, Wyo. (Wesley H. Doan and Marlin W. Burke, Lakewood, Colo., on brief), for defendant-appellant.

Before SETH, Chief Judge, and McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Dennis Flynn (Flynn), individually and as Sheriff of Laramie County, Wyoming, appeals from a damage award judgment granted to plaintiff-appellee, Craig Charles Clappier (Clappier), in total amount of $24,500.00. The judgment followed a verdict awarded by a jury of six.

*Factual Background*

We will briefly recite the facts and circumstances of this case, keeping in mind that in civil jury determinations, findings and awards are presumed to be correct and that, on appeal, it is not the function of the reviewing court to try the facts. *Sabol v. Snyder,* 524 F.2d 1009 (10th Cir. 1975); *Boehm v. Fox,* 473 F.2d 445 (10th Cir. 1973). On appeal, we must view the evidence, and all reasonable inferences to be drawn therefrom, in favor of the jury verdict; and all factual conflicts must be resolved in favor of the verdict. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Jaeco Pump Company v. Inject-O-Meter Manufacturing Company,* 467 F.2d 317 (10th Cir. 1972); *Westinghouse Credit Corporation v. Green,* 384 F.2d 298 (10th Cir. 1967).

Clappier, a citizen of Minnesota, then serving as an airman stationed at Warren Air Force Base, Cheyenne, Wyoming, was arrested by city police late on the evening of May 13, 1975, and booked into the Cheyenne City Police Station. He was charged with assault and battery with intent to commit rape. Clappier was thereafter transferred to the Laramie County, Wyoming, jail in Cheyenne shortly prior to noon on May 14, 1975. At all times, Flynn served as Sheriff of Laramie County, Wyoming, charged with the maintenance and conduct of the county jail and the care of prisoners confined therein.

Before Clappier was placed in the county jail cell block, he requested to see an attorney and to place a phone call. He was permitted to phone his mother. He was not advised of any rules, regulations or policies of the jail. Clappier was given a mattress and advised to find an empty cell. After doing so, he ate lunch. Shortly thereafter, an inmate named McIntosh inquired of Clappier what he was charged with. Clappier responded that he was charged with attempted rape and assault. McIntosh remarked, "You are going to be in a lot of trouble." [R., Vol. V, p. 49.] McIntosh asked Clappier to come to his cell and Clappier complied. They visited. During this time, McIntosh rubbed his hand on Clappier's leg and ran his hand through his hair, remarking that they could be very good friends. Clappier pushed McIntosh away, stating that "I don't want anything to do with what you have in mind." [R., Vol. V, p. 51.] When Clappier tried to leave McIntosh's cell, McIntosh shoved him onto the bunk and hit him with his fists. He struck Clappier hard in the face, the groin and the head. He then picked him up and threw him into a corner. Clappier estimated that McIntosh struck him 40 or 50 times. Clappier tried to fend off the blows and he yelled out. McIntosh told him to shut up and "Don't yell again or else." [R., Vol. V, p. 53.] Clappier testified that no one came to his aid and because he had already been "beaten up" and placed in danger he was afraid and believed that he would be more severely or continuously beaten if he yelled. [R., Vol. V, p. 53.] Another inmate named Mesteth, a cellmate of McIntosh, then came to and blocked the doorway of the cell as McIntosh continued to hit Clappier with his fists. McIntosh asked Clappier, "Are you going to do what I want?" Clappier again refused. McIntosh then released him to his

cell to "think about it over the evening and we will see what happens tomorrow." [R., Vol. V, p. 54.]

That night, McIntosh came to Clappier's cell and reminded him to think about the matter. That same evening a trusty delivered Clappier's dinner by passing the tray through a portal. Clappier had not seen "any jailer or deputy sheriff" in the cell block area since lunch with the exception of the brief appearance of Deputy Sheriff Joyce who came to release a prisoner. Joyce told all prisoners to stand outside of their cells near the cell doors while the prisoner was being released. Deputy Joyce did not approach Clappier [R., Vol. V, pp. 56–57.] Again that evening, about 9:00 or 10:00 p. m., two deputy sheriffs walked through the "exercise room" area of the cell block (consisting of eight cell doors) after all lights were out, making "head checks" with aid of a flashlight. [R., Vol. V, p. 58.] The two deputy sheriffs stopped at Clappier's cell and after flashing the light on him inquired who he was. Clappier identified himself and stated that he had been placed in the cell block that day. The deputies moved on. When asked why he did not then request help from the deputy sheriffs, Clappier testified:

Q. Did you tell them what had happened to you? .

A. No.

Q. Why not?

A. One reason was because McIntosh told me not to say anything to anybody.

Q. Why would you do what he said?

A. Well, he was in the same cell block. If I would have said anything to these gentlemen, I'm sure he would have heard me. The other prisoners could hear me. It was quiet and I'm sure they could hear me. ·

Q. And if he heard you, what do you think would happen?

A. That I would receive more beating the next day.

Q. Did you want to avoid that?

A. Most certainly, yes.

Q. Did you think that the deputy sheriffs would help you?

A. They didn't seem to have much of an attitude when they walked through, it was like their job.

Q. . . . from the time you were placed in lower east cell block on May the 14th how many other inspections were conducted other than the lock-up inspection that you referred to?

A. There were no inspections conducted.

Q. Security or otherwise?

A. Not that I know of.

[R., Vol. V, pp. 59–61.]

Clappier testified that at no time did he see any deputy sheriff or other sheriff's employee in the guards' walkway or corridor; that no roll calls were taken; that the only time the deputies came into the exercise area (walkway-corridor) was to take the "head count" at night lock-up; and that meals were served by trusties only.

On the morning of May 15, 1975, following breakfast, McIntosh came to Clappier's cell and inquired if Clappier had thought about what he had been told. Clappier did not respond. Thereupon, McIntosh grabbed Clappier by the arm, dragged him to McIntosh's cell, and threw Clappier on the bed. McIntosh then compelled Clappier to perform two unnatural oral sexual acts to McIntosh's satisfaction. [R., Vol. V, pp. 63–67.] When asked why he did not call out for help, Clappier stated that after McIntosh had compelled him to commit the second unnatural sexual act, McIntosh told him "Don't say a word about this or I'll kill you." [R., Vol. V, p. 67.] With the exception of a trusty who served lunch through the cell "counter" no jailer or sheriff's deputies entered the cell block area that entire morning and well into early afternoon until a deputy brought another prisoner in. That afternoon, McIntosh went to Clappier's cell, and, for the third time, forced Clappier to perform an unnatural oral sex act on him. [R., Vol. V, pp. 70–72.] That evening Clappier was badly beaten by inmates Hengst, Mesteth, McIntosh and Brown. [R., Vol. V,

pp. 74–87, 174, 176, 177.] Further, Clappier was threatened by inmate Clifford Brown who had obtained a mop handle and threatened to use it on Clappier. [R., Vol. V, pp. 82–84.]

During the morning of May 16, 1975, Clappier was taken from his cell block and for the first time photographed and fingerprinted. It was then that his injuries were discovered by Deputy Joyce, who inquired of Clappier what had happened. Clappier responded that he had fallen in the shower, which is what McIntosh and Brown had told him to relate. [R., Vol. V, p. 94.] Deputy Joyce responded, "That is a bunch of malarky" or "Don't lie to me." [R., Vol. V, p. 94.] Clappier requested of Joyce that he be permitted to make a call. He was permitted to do so. While speaking on the phone, Clappier observed his father and uncle arriving at the Laramie County Jail. Shortly thereafter, Clappier was taken by a deputy to Francis E. Warren Air Force Base Hospital where his various bruises were treated and X-rays disclosed that he had suffered a fractured jaw. [R., Vol. V, p. 100.] Clappier's father posted bond for his release from custody at the Laramie County Jail on May 16th. That same day the charges were reduced to breach of the peace, to which Clappier pled guilty. The fine of $25.00 was suspended. [R., Vol. V, p. 101.] Clappier was then taken to Fitzsimmons Army Medical Center in Denver by his father and uncle where he remained for over four weeks. His broken jaw was wired and set. He suffered considerable pain. [R., Vol. V, pp. 102–105.]

On one occasion during his incarceration, a trusty did observe Clappier following beatings administered to him. The trusty did not report the matter to anyone. With the exception of the evening "lights out" lockup head count, no roll call or unannounced inspections of the prisoners' cells were made by the Sheriff or his deputies while Clappier was jailed. Sheriff Flynn was never in physical or other communication with Clappier during his incarceration.

Flynn testified that if Clappier had complained to his deputies, action would have been taken to protect him. C. W. Ogburn, Sheriff of Carbon County, Wyoming, testified that he had served some 17 years in that capacity, and had been present in the courtroom during the entire course of the trial of the case at bar. He testified on behalf of Flynn. When asked whether, based on his training and experience, and in the absence of a complaint by a prisoner to a trusty, inspections or visitation by deputies at the intervals made as hereinbefore recited were reasonable under the circumstances then existing, Sheriff Ogburn responded affirmatively. He stated that the jailer and his deputies depend upon the prisoners to bring complaints to their attention. In Ogburn's opinion, Flynn was operating the Laramie County Jail in a reasonable manner during Clappier's incarceration. [R., Vol. VI, pp. 400–403.] Ogburn related that there is always trouble in a jail because of having so many people with varied personalities and character traits so close together and that the jailer must be informed of any trouble in order to take proper steps. [R., Vol. VI, pp. 409–411.] He stated that prisoners are handed rules and regulations at the Carbon County Jail and told to contact the jailer if they need help.

There was no evidence that Flynn had any connection with or even knew Clappier at any time during Clappier's incarceration.

### Litigative Background

Clappier's amended complaint for damages, in the amount of $75,000.00 was predicated on two primary grounds for relief: *First,* a claim based on common law alleging negligent conduct and/or omissions by Flynn in failing to operate the Laramie County Jail in accordance with Wyoming statutes and the Wyoming Constitution, which failure resulted in damages to Clappier. The jurisdictional basis for this claim was diversity of citizenship and amount in controversy in excess of $10,000.00, and, *Second,* a claim under the Civil Rights Act alleging that Clappier was deprived of those rights, privileges and immunities secured to him by the United States Constitution, i. e.,

the right to be free from the infliction of cruel and unusual punishment proscribed by the Eighth Amendment. This claim alleged that Flynn was negligent in not assuming his responsibilities prescribed by certain Wyoming statutes, the Wyoming Constitution and the common law to operate, control and supervise the Laramie County Jail and to supervise his deputies and other personnel at the jail; further, that such failure occurred while Flynn was acting under color of state law. The civil rights claim was founded on 42 U.S.C. Sec. 1983.

Clappier moved for leave to amend his complaint to include an allegation of punitive damages, allegedly actionable both under 42 U.S.C. Sec. 1983 and the common law. [R., Vol. IV, pp. 3–4.] Counsel for Flynn objected to the motion on the grounds that it would be necessary, if the motion should be granted, to ". . . immediately notify the sheriff that those damages are not covered by the policy of insurance . . ." [R., Vol. IV, p. 4.] The trial court observed that Clappier was seeking an award of $175,000.00 (sic) in actual damages and that the case had been pending for 13 months, with trial set in a few days; accordingly, the motion to amend for award of punitive damages was denied. [R., Vol. IV, pp. 4–6.] Failure to previously move to so amend was acknowledged as an oversight by Clappier's counsel. [R., Vol. IV, p. 5.]

### The Trial and Judgment

In the course of his opening statement to the jury, Clappier's counsel stated that the total claim for damages amounted to $75,-000.00, $3,724.00 of which represented medical expenses with the balance representing injuries, deprivations and suffering sustained by Clappier as a result of Flynn's negligence and civil rights deprivation. [R., Vol. V, pp. 13–15].

At the conclusion of trial and closing arguments, the trial court instructed the jury, *inter-alia:*

I stated at the outset that this is an action grounded in negligence, it being the theory of the plaintiff that the sheriff

was negligent, and that his negligent act or acts was the direct and proximate cause of the injuries which he alleged that he sustained.

The Defendant, on the other hand, has interposed the defense of contributory negligence and I will instruct you both on negligence and contributory negligence. [R., Vol. VII, pp. 441, 442.]

The trial court then instructed the jury that negligence is judged on the basis of what an ordinary prudent person would have done under a given set of circumstances, and that contributory negligence is based on the want of ordinary care by the person injured contributing to the injury as a proximate cause. The court then said:

I stated, and I'll repeat again, that this case is in two claims: The first one of negligence and second it is a civil right action, and your verdict that I will submit to the jury will specify and I'll explain those verdicts to you before you retire. [R., Vol. VII, p. 443.]

In instructing on the claim for relief under 42 U.S.C. Sec. 1983, the court explained the historical background of the Civil Rights Act and then stated:

You are further instructed that to be actionable under Section 1983 the acts complained of must be done, 1, under color of state or local law and, 2, must amount to a depredation [sic] of a constitutionally protected right, in this case freedom from the infliction of cruel and unusual punishment.

You are further instructed that under the law of the State of Wyoming the sheriff is responsible for the action and negligence of the jailers he appoints. The duty of the sheriff to keep prisoners entrusted to his care safe is not absolute, but it only requires the exercise of ordinary diligence under the circumstances.

You are further instructed that the Wyoming constitution at the time of the occurrence in question provided, and I quote "No person arrested and confined in jail shall be treated with unnecessary rigor. And the humane treatment of prisoners shall be provided for."

You are further instructed that as custodian of the jail and the prisoners confined therein, the Defendant had the lawful authority and duty under state law to prevent escape; to prevent one prisoner from injuring another; to enforce discipline among the prisoners; and to enforce regulations governing the conduct and orderly operation of the jail. Before the Plaintiff can recover in this case, he must prove that the Defendant knew or had reason to know that the prisoners that committed the batteries were likely to do so. If you find from a preponderance of the evidence in the case that the Defendant could not reasonably have foreseen that the Plaintiff would be assaulted and battered by other prisoners, then in that event the Plaintiff cannot recover.

You are further instructed that the intent and purpose of the Civil Rights Act which has been read to you is to insure the vindication by a person for violation of civil rights guaranteed by the Constitution and laws of the United States. *You are further instructed the test of whether there has been a violation of Craig Clappier's constitutional right to be free from cruel and unusual punishment is whether the assault, as determined by you, is sufficiently severe in the circumstances to shock the conscience of a reasonable person.* (Emphasis supplied.)
[R., Vol. VII, pp. 444, 446.]

The defendant objected to the above instructions on the civil rights claim for relief on the grounds that it did not constitute a "valid" civil rights action over which the court had jurisdiction and further:

. . . object to the Court's having instructed the jury that the test of liability of the Defendant in this case is whether or not the injuries and the assault and battery which occurred was such as would shock the conscience of reasonable persons, *it being the position of the Defendant in this case that in order to recover the Plaintiff must show gross negligence, and that the Plaintiff had actual knowledge of facts and circumstances so*

*as to constitute gross negligence in this case and that in fact is the protest.* (Emphasis supplied.)
[R., Vol. VII, pp. 452, 453.]

The Defendant's objections to the aforesaid instructions were overruled.

The Court submitted three verdict forms to the jury.

On the negligence claim, the Court instructed the jury that they must "percentage" the verdict based on the proximate cause of the injuries to Clappier, the verdict to be completed as follows:

Plaintiff, Craig Charles Clappier, blank percent.

Defendant, Dennis Flynn, blank percent.

Total must be one hundred percent.
[R., Vol. VII, p. 455.]

The Court then instructed that there are two claims, with verdicts applicable to each, as follows:

The first, We, the jury duly impaneled in the above-entitled case, do find in favor of the Plaintiff, Craig Charles Clappier, and against the Defendant, Dennis Flynn, and assess damages for the injuries resulting from Defendant Dennis Flynn's negligence in the sum of blank dollars.

We, the jury impaneled in the above-entitled case, do find in favor of the Plaintiff, Craig Charles Clappier, and against the Defendant, Dennis Flynn, and assess damages for violation of Plaintiff's civil rights in the sum of blank dollars and signed, foreman.
[R., Vol. VII, pp. 455, 456.]

After the jury retired for deliberations, it submitted a note to the Court. The jury was then returned to open court. The jury inquiry was a ". . . desire to have the definition of violation of Plaintiff's rights, further, Judge Kerr's instructions for negligence." [R., Vol. VII, p. 458.] The court thereupon reiterated the prior instructions on the law of civil rights and the law of negligence. The Court stated, *inter-alia*:

You are further instructed the test of whether there has been a violation of Craig Clappier's Constitutional right to

be free from cruel and unusual punishment is whether the assault, as determined by you, if you determine there was an assault, is sufficiently severe under the circumstances to shock the conscios (conscience) of a reasonable man.

Now, as to the negligence, I recognize all of you except one, I think, are sitting on a jury for the first time and it is difficult to absorb all these instructions at one time.

I defined negligence for you and contributory negligence. There are two claims as I explained at the outset. One is for negligent acts on the part of the sheriff and the other is for violation of the Plaintiff's civil rights.

[R., Vol. VII, p. 461.]

The trial court concluded its supplemental remarks to the jury by instructing again on the matter of "percentage" or "comparative" negligence. The Court inquired of counsel whether there were any objections or suggestions to the instructions, other than those previously lodged. No objections or suggestions were voiced.

Shortly after the Court's supplemental instructions were given, the jury reached these verdicts:

We, the jury . . . find that the negligence which proximately caused the injuries to Craig Charles Clappier to be as follows:

Plaintiff . . . Clappier, five percent.
Defendant . . . Flynn, ninety-five percent.
Total, one hundred percent.

\* \* \* \* \* \*

Verdict on damages.

We, the jury . . . find in favor of . . . Clappier, and against . . . Flynn, and assess damages for the injuries resulting from . . . Flynn's negligence in the sum of $10,000.00.

We, the jury . . . find in favor of . . . Clappier, and against . . . Flynn, and assess damages for violation of the Plaintiff's civil rights in the sum of $15,000.00.

[R., Vol. VII, pp. 464–465.]

Judgment on the verdict was entered December 22, 1977 awarding Clappier $9,500.00, representing the sum of the negligence count verdict, less the 5% contributory negligence, against Flynn, Sheriff of Laramie County, Wyoming, individually and in his representative capacity, and the sum of $15,000.00 against Flynn, Sheriff of Laramie County, Wyoming, individually and in his representative capacity, as damages assessed by the jury for violation of Clappier's civil rights. [R., Vol. II, p. 324.]

*Issues on Appeal*

Flynn presents the following issues on appeal: (1) that the court erred in instructing the jury concerning the claim brought under 42 U.S.C. Section 1983 inasmuch as no federal question was presented because the action was presented as a simple negligence claim, and an actionable tort under 42 U.S.C. Sec. 1983 is by definition an intentional tort, (2) that the court erred in instructing the jury on the standard of care required of Flynn, that is, the instruction should have defined the standard as gross negligence rather than simple negligence, (3) that the court erred in instructing the jury on both a simple negligence theory and a deprivation of rights under 42 U.S.C. Sec. 1983 when both theories were based on exactly the same facts, thus allowing double recovery for the same injury, (4) the court erred in admitting medical bills without foundation testimony regarding the reasonableness and necessity of such medical services, and (5) the court erred in instructing the jury concerning elements of damages that had never been mentioned in Clappier's pleadings or in testimony at trial.

*Did the Trial Court Err in Submitting Two Verdicts Based on Two Distinct "Claims" to the Jury?*

We commence the discussion of this issue with the observation that counsel did not lend substantial aid to the trial court in this area of concern.

Clappier predicated his complaint on two distinct legal theories: *First,* based on

Flynn's negligent conduct and/or omissions in failing to properly operate and conduct the county jail in accordance with certain Wyoming statutes and the Wyoming State Constitution; and *Second,* the remedies available under 42 U.S.C. Sec. 1983 for deprivation of civil rights, in this instance, one's right to be free from the infliction of cruel and unusual punishment in violation of the Eighth Amendment. The sole relief prayed for under each legal theory was that of compensatory damages. No punitive damages were prayed for or pled.

■ As indicated earlier, the trial court submitted two verdict forms to the jury, one for each legal theory. Clappier did not object to the submission of the two verdicts. Similarly, Flynn did not expressly object to the submission of the two verdicts. He did, however, object to the submission of the 42 U.S.C. Sec. 1983 issue via instructions to the jury, on the grounds that it did not constitute a "valid" civil rights action over which the court "could have jurisdiction." This is, to be sure, a shotgun objection. It is hardly informative to the trial court in relation to the "double recovery" argument advanced by Flynn for the first time on appeal. Nevertheless, the general objection to the civil rights instructions was such that it preserved the challenge of the submission of the two verdicts for review.

■ It is well settled, of course, that if the actions of law enforcement officers result in a deprivation of a federally protected right, the existence of an adequate state remedy does not bar recovery under 42 U.S.C. Sec. 1983. See: *Egan v. Aurora,* 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 (1961). The "federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), *overruled in part, Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ In terms of pleading and joining the state tort remedy with the "supplemental" federal remedy, courts have allowed both legal theories to proceed in the same suit either on the grounds that the state tort law remedy is supported by an independent jurisdictional basis, as in this case, or on the grounds that, in the court's discretion, it may be heard under the doctrine of "pendent" jurisdiction. See: *Anderson v. Nosser,* 438 F.2d 183 (5th Cir. 1971), modified on other grounds, *sub nom., Nosser v. Bradley,* 456 F.2d 835 (5th Cir. 1972), *cert. denied,* 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972).

■ When state tort claims have been joined with federal civil rights actions, the Supreme Court has traditionally looked to principles of common law in fashioning suitable remedies. See *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). In *Carey,* the Supreme Court noted that 42 U.S.C. Sec. 1988 authorizes courts to look to the common law of the states where "necessary to furnish suitable remedies" under Section 1983 and then observed:

> It is not clear, however, that common-law tort rules of damages will provide a complete solution to the damages issue in every Sec. 1983 case. In some cases, the interests protected by a particular branch of the common law of torts may parallel closely the interests protected by a particular constitutional right. In such cases, it may be appropriate to apply the tort rules of damages directly to the Sec. 1983 action. See *Adickes v. S. H. Kress & Co.,* 398 U.S. [144] 231–232 [90 S.Ct. at 1641, 26 L.Ed.2d 142] . . . In other cases, the interests protected by a particular constitutional right may not also be protected by analogous branch of the common law of torts. See *Monroe v. Pape,* 365 U.S., [167] at 196, and n. 5 [81 S.Ct. 488]; . . . *Adickes v. S. H. Kress & Co., supra,* [398 U.S.] at 232 [90 S.Ct. 1598] . . . ; *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S., [388] at 394 [91 S.Ct. 1999, 29 L.Ed.2d 619]; *id.,* at 408–409 [91 S.Ct. 1999]. . . . In those cases, the task will be the more difficult one of adapting common-law rules of damages to provide fair compensation for injuries caused by the depriva-

tion of a constitutional right. \* \* \* In order to further the purpose of Sec. 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question—just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law. We agree with Mr. Justice Harlan that "the experiences of judges in dealing with private [tort] claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of [constitutional] rights." *Bivens v. Six Unknown Fed. Narcotic Agents, supra,* [403 U.S.] at 409 [91 S.Ct. 1999] . . 435 U.S. at pp. 258–259, 98 S.Ct. at pp. 1049–1050.

■ With these principles in mind, we believe that it is evident that the district court erred in awarding judgment under more than one theory of liability on the claims as pled.

In our view, the factual situation presented here is such that the common law tort rules of damages in negligence actions will provide a satisfactory solution to the damages issue. The interest protected by the common law of negligence, as applied to the facts here, parallels closely the interest protected by the Eighth Amendment prohibition against cruel and unusual punishment. *Carey v. Piphus, supra,* authorizes the courts to "apply the tort rules of damages directly to the § 1983 action." 435 U.S. at page 258, 98 S.Ct. at page 1049. Thus, the relief afforded under the common-law of torts and Section 1983 is identical (compensatory damages). As such, the two claims for relief pled in this case are simply alternative bases for seeking the same relief, in much the same way as negligence, breach of express and implied warranties, and strict liability are alternative theories for according a damaged plaintiff in a products liability action identical relief. It is clear, particularly in products liability suits, that a plaintiff is not entitled to a separate compensatory damage award under each legal theory. Rather, he is entitled to only one compensatory damage award should liability be found on any of the three, or more than the three theories involved.

■ This circuit has, although not in the precise context involved herein, faced this issue of "double recovery". See *Stringer v. Dilger,* 313 F.2d 536 (10th Cir. 1963). *Stringer, supra,* involved a suit brought against a state highway patrolman for compensatory and punitive damages on "two causes of action", one founded on 42 U.S.C. Sec. 1983 (arrest and seizure without probable cause) and the other on common law assault and battery. We there recognized that Section 1983 provides a civil remedy in the federal courts and that it is to be read against the background of tort. The trial court, in *Stringer, supra,* permitted both "causes of action" to go to the jury. The plaintiff (Dilger) prevailed and was awarded both compensatory and punitive damages on *each* cause of action. Following rendition of judgment, the trial court set aside the judgment granted on the 1983 action. On appeal this court reversed and remanded. In ordering reinstatement of the judgment on the first cause of action (1983) this court recognized, however, that double recovery cannot be allowed. We there said:

> In further argument opposing the reinstatement of the judgment, appellee says that the verdicts rendered upon the two causes of action allowed a double recovery for bodily injuries. Except in cases in which punitive damages may be allowed, an injured party may recover damages only for the actual loss he suffered and no more; he is to be made whole, but not entitled to be put in a better condition than he would be in had the wrong not been committed. *Missouri Pacific Railroad Company v. H. Rouw Company,* 5 Cir., 258 F.2d 445, *cert. denied,* 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 . . ; 15 Am.Jur. Damages, § 13, pp. 402–404. After examining the court's instruction

as to the measure of damages on the first cause[5], and assuming the jury followed the instruction, we agree with appellee. Although, we cannot ascertain what part of the verdict on the first cause of action was awarded for personal injuries, we can look to the verdict on the second cause of action to determine the amount fixed by the jury as compensation for bodily injuries, as the entire amount of this verdict was for bodily injuries and resulting damages. Therefore, in reinstating the judgment on the first cause of action, that judgment should be reduced in the amount· of recovery had on the second cause of action for compensatory damages. (Footnote omitted.) 313 F.2d at pp. 541, 542.

◼ Thus, *Stringer* declares that double recovery is precluded when alternative theories seeking the same relief are pled and tried together. Unlike *Stringer,* however, we are here faced with the situation where one claim for relief involves the comparison of fault between the plaintiff and the defendant, while the other (Section 1983) does not allow such comparison. Inasmuch as comparative negligence has been pled with the 1983 action, the trial court must devise a method of instructing the jury in a manner which avoids the confusion and complication necessarily engendered in trying a comparative fault claim for relief with a non-comparative fault claim for relief.

With the exception of New Mexico, *Syroid v. Albuquerque Gravel Products Co.,* 86 N.M. 235, 522 P.2d 570 (1974), the states of this Circuit have adopted the so-called "less than" variation of the "modified" comparative negligence doctrine. *See: Anno., Comparative Negligence Doctrine,* 78 A.L.R.3d 339, 335–336 (1977). The applicable Wyoming statute applied by the trial court in the instant case is Wyoming Statutes 1977, Sec. 1–1–109. That statute provides that the court may, and when requested by any party, shall direct the jury to find separate special verdicts determining the percentage of negligence attributable to the parties and the amount of damages found. The

statute directs that the court inform the jury of the consequences of its determination of the percentage of negligence. Our review shows that in the case at bar the trial court carefully complied with the requirements of the Wyoming statute.

◼ The difficult problem presented to the trial court in the case at bar was that of properly instructing the jury both on the comparative negligence claim and the non-comparative civil rights claim in a manner which would avoid duplicity, confusion and double recovery. In our view this may well be accomplished by wise use of special interrogatories to be submitted to the jury pursuant to Fed.Rules Civ.Proc. rule 49, 28 U.S.C.A. Such interrogatories could require findings on *both claims* with accompanying special verdict forms which should provide the district court a clear, adequate basis for entry of the appropriate judgment.

◼ In the instant case, should the jury determine that Flynn's liability is to be grounded in negligence *only,* the total damages assessed shall be reduced, of course, by that percentage of negligence attributed to Clappier. If, however, the jury should find that Flynn is liable to Clappier for damages in violation of Clappier's Eighth Amendment rights under 42 U.S.C. Sec. 1983 *only,* then the total amount of damages assessed should be awarded.

◼ Similarly, if Flynn is found to have been *both* negligent and to have violated 42 U.S.C. Sec. 1983, the Sec. 1983 action should prevail and Clappier should be awarded the total amount of damages found thereunder. We believe that such is required inasmuch as a higher standard of culpability exists in a Sec. 1983 action charging cruel and unusual punishment than in an action based upon negligence in circumstances similar to that which occurred herein. This assumes, as we must, that the damages award will necessarily be equal or greater on the determination of liability under the Sec. 1983 claim.

Of course, should Flynn be found to be free of negligence and not to have violated

Clappier's civil rights, a defense verdict must be entered.

In summary, we conclude that, inasmuch as both the federal claim for relief and the state claim for relief in the case at bar arose from the same, identical, operative facts, both of which sought identical relief, i. e., compensatory damages (with some exceptions not relevant in view of our disposition) that it was error to award judgment under more than one theory of liability on the claims as pled. To do so constitutes "double recovery".

*Did the Court Err in Instructing the Jury on the Degree of Proof Required to Establish A Section 1983 Claim for Damages Under the Facts and Circumstances of This Case?*

It is Flynn's contention that the facts of this case do not give rise to a federal constitutional claim against him under Section 1983 based upon Clappier's assertion that his right to be free from cruel and unusual punishment secured to him by the Fourteenth Amendment was violated by Flynn's failure to act under color of state law, i. e., to protect Clappier while he was incarcerated in the Laramie County Jail. Flynn contends that because he was never present when Clappier allegedly suffered his deprivations—and, in fact, was unaware that Clappier was even incarcerated—that he cannot be liable for simple acts of omission based upon his alleged failure to establish proper procedures and standards for the operation and conduct of the jail which might have protected Clappier from the injuries and deprivations he suffered.

Clappier, however, contends that proof of simple negligence (whether by omission or commission) against Flynn under 42 U.S.C. Sec. 1983 establishing that he suffered cruel and unusual punishment because Flynn did not comply with his state statutory and constitutional duties relating to the conduct and operation of the county jail, is sufficient to support the federal cause of action.

Our starting point is *Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251* (1976), *remanded,* 554 F.2d 653 (5th Cir.

1977). The Supreme Court there held that to prevail in a Section 1983 suit based on cruel and unusual punishment, a prisoner must prove that the conduct in question runs counter to evolving standards of decency or involves the unnecessary and wanton infliction of pain. Interpretive of *Estelle v. Gamble, supra,* the Court in *Fielder v. Bosshard, 590 F.2d 105* (5th Cir. 1979), held that mere negligence, neglect or medical practice is insufficient to establish a Sec. 1983 cruel and unusual punishment suit and that, at a minimum, the plaintiff must show that prison officials acted with a conscious or callous indifference.

Clappier contends that our decisions in *Bethea v. Crouse, 417 F.2d 504* (10th Cir. 1969) and *Stringer v. Dilger, supra,* support the maintenance of the instant action ". . . under the Civil Rights Act, 42 U.S.C. Sec. 1983, where the Plaintiff alleges the deprivation of a right, privilege or immunity secured by the United States Constitution and laws and that such deprivation resulted from conduct (either omission or commission) under color of state law." [Brief of Appellee, p. 6.] This contention, standing alone, is valid. When applied to the facts of the case at bar, it amounts to an oversimplification of the applicable rule.

*Bethea, supra,* was a Sec. 1983 civil rights damage action brought by two inmates of the Kansas State Penitentiary against Warden Crouse. The petitioners alleged that they were subjected to cruel and unusual punishment prohibited by the Eighth Amendment when they were severely beaten by another inmate in the presence of the Warden, the Deputy Warden and other prison officials who allegedly "arranged" and "condoned" the confrontation in order to obtain information from them. The District Court granted summary judgment to the defendants. This Court reversed and remanded for trial to determine whether the alleged mistreatment occurred and whether the warden and his associates were present and permitted the beatings to occur. It was in this setting that the Court opined that the determination of what punishment constitutes "cruel and unusual" is a

"difficult question." We concluded that under the circumstances as alleged the "reasonable man test" should be applied to the end that the ultimate issue is whether the assault and battery found by the fact finder is sufficiently severe in the circumstances to shock the conscience of a reasonable man. The significant difference between *Bethea* and the instant case is that Warden Crouse (per allegation) was present and allegedly actively condoned the beatings, while here Sheriff Flynn lacked knowledge of Clappier's incarceration and the injuries inflicted upon him. The trial court, in the case at bar, evidently relied on the applicability of *Bethea* in instructing the jury on the Sec. 1983 "cause of action." This reliance was misplaced.

In *Stringer v. Dilger, supra,* we held that the evidence adduced in a trial brought by a motorist against a state highway patrolman upon two causes of action, one founded on 42 U.S.C. Sec. 1983, and one founded upon a state claim alleging assault and battery was such as to permit the Sec. 1983 cause to go to the jury on both the issues of compensatory and punitive damages. That holding was based on facts establishing that the state highway patrolman had arrested the plaintiff motorist without probable cause and then proceeded to seize the motorist's vehicle, file charges of driving while under the influence of intoxicating liquor and commit assault and battery upon the motorist, all without cause. We recognized that while the Civil Rights Act was not enacted to discipline local law enforcement officials that it was nevertheless intended to subject them ". . . to civil liability under Sec. 1983 in cases involving deprivations, under color of state law, of rights guaranteed by the Constitution and laws of the United States and particularly by the Due Process Clause of the Fourteenth Amendment." 313 F.2d, at pp. 540, 541. There is nothing in that opinion indicating that separate, distinct damage awards could be granted on the *two causes of action.* Furthermore, *Stringer* did not deal precisely with the damage-measurement process.

In our view the decision controlling in the case at bar is *Dewell v. Lawson, 489 F.2d 877* (10th Cir. 1974). There a Sec. 1983 civil rights action was brought against the City of Oklahoma City and its chief of police, individually and in his official capacity, for damages allegedly incurred by Dewell when he suffered permanent brain damages by reason of a diabetic attack while incarcerated. The defendant chief of police, who was absent from Oklahoma City at all times that Dewell was incarcerated, was dismissed from the suit by the district court. The facts of that case, as alleged in the complaint, are, in many respects, similar to those in the instant case. Dewell, a practicing dentist residing in Oklahoma City, apparently left his home while under a diabetic reaction. His wife, greatly concerned for his well being, phoned the Oklahoma City Police Department on several occasions fully identifying her husband and explaining his acute condition. She emphasized that he required insulin in order to avoid serious physical impairment. She related that Dewell wore a diabetic warning. Dewell was thereafter arrested by an Oklahoma City police officer on a charge of public drunkenness and incarcerated in the Oklahoma City Jail. Notwithstanding Mrs. Dewell's prior calls, no connection or identification whatsoever was made of Dewell as the person she had expressed such grave concern for, even though Dewell carried on his person the complete identification related by his wife.

Following Dewell's arrest, his wife alleged that she made repeated calls to the Department in her efforts to locate him. At no time was Dewell "connected" with her calls. As a result, he suffered a stroke and diabetic attack while incarcerated from which he incurred permanent brain damage. In his Sec. 1983 complaint against the absent Chief of Police Lawson, Dewell alleged that Lawson's failure to establish procedures within the Oklahoma City Jail to identify missing persons, detect persons suffering from a diabetic condition and provide medical care as required by state law was actionable as violative of the Eighth Amendment commands against the infliction of cruel and unusual punishment. We

reversed the District Court's dismissal of Chief Lawson and remanded. We said:

> Appellant Dewell concedes that to be actionable under 1983, the acts of Chief Lawson complained of must have been done: (a) under color of state or local law; and (b) amount to a deprivation of a federal constitutionally protected right which, in this case, is freedom from the infliction of cruel and unusual punishment. Dewell argues that Chief Lawson's failure to establish procedures and to train personnel to protect against the damage which resulted to Dewell's person following his arrest and incarceration by reason of his diabetic condition is actionable as Lawson was negligent in not supervising his subordinates, citing to *Carter v. Carlson,* 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), rev'd on other grounds, 409 U.S. 418 [93 S.Ct. 602, 34 L.Ed.2d 613] . . . While recognizing that cruel and unusual punishment, as a constitutional concept, is a principle which has not traditionally lent itself to precise definition, Dewell argues that conduct may be actionable as a deprivation of constitutional rights where no force or violence has been utilized and where the conduct constitutes an act of omission. *Howell v. Cataldi,* 464 F.2d 272 (3rd Cir. 1972); *Roberts v. Williams,* 456 F.2d 819 (5th Cir. 1971), cert. denied, 404 U.S. 866 [92 S.Ct. 83, 30 L.Ed.2d 110], . . . *The standard of liability in a case alleging cruel and unusual punishment relating to a claimed omission of medical care is whether the plaintiff proves exceptional circumstances and conduct so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to basic fairness.* *Gittlemacker v. Prasse,* 428 F.2d 1 (3rd Cir. 1970); *Bishop v. Cox,* 320 F.Supp. 1031 (W.D.Va.1970). Failure to procure urgently needed medical attention may amount to cruel and unusual punishment. *Coleman v. Johnston,* 247 F.2d 273 (7th Cir. 1957); *Owens v. Alldridge,* 311 F.Supp. 667 (W.D.Okla.1970). (Emphasis supplied.)

489 F.2d at pp. 881, 882.

We hold that the same, identical standard of liability applied in *Dewell v. Lawson, supra,* is applicable to the allegations of cruel and unusual punishment under the Sec. 1983 cause of action stated in the case at bar. Further we must hold that it was error to instruct the jury that the test of cruel and unusual punishment here is ". . . whether the assault, as determined by you, is sufficiently severe in the circumstances to shock the conscience of a reasonable person." [R., Vol. VII, pp. 444–446.]

We recognize that the degree of the harm or injury inflicted is intertwined with the action or inaction allegedly responsible therefor. Even so, the area of concern in terms of a Sec. 1983 liability involving an allegation of cruel and unusual punishment *relating to a claimed omission* requires proof of exceptional circumstances and conduct so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to basic fairness. Such, in our view, is consistent with those opinions interpreting the term "cruel and unusual punishment" forbidden by the United States Constitution as meaning something inhuman, barbarous, violative of basic concepts of decency and so foul as to shock the court's sensibilities. *Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630* (1958); *Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793* (1910); *Carter v. Cuyler, 415 F.Supp. 852* (E.D.Pa.1976). Perhaps the degree of proof required under *Dewell v. Lawson, supra,* relating to claimed acts of omission constituting "cruel and unusual punishment" is comparable to that required to support an award of exemplary or punitive damages. The trial court's instructions to the jury on the Sec. 1983 cause of action in the case at bar should have been couched in such language. We are cognizant that the trial court was provided scant guidance in this difficult area. The very recent opinion of the United States Supreme Court in the case of *Baker v. McCollan,* —— U.S. ——, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), in significant dicta, pinpointed the problem by this language:

> . . . [W]e have come to the conclusion that the question whether an allega-

tion of simple negligence is sufficient to state a cause of action under Sec. 1983 is more elusive than it appears at first blush. *It may well not be susceptible of a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a Sec. 1983 action.* In any event, before the relationship between the defendant's state of mind and his liability under Sec. 1983 can be meaningfully explored, it is necessary to isolate the precise constitutional violation with which he is charged. (Emphasis supplied.)

—— U.S. at p. ——, 99 S.Ct. at p. 2692.

In *Butler v. Commissioner of Mental Health, 463 F.Supp. 806* (E.D.Tenn., 1978), suit was filed against officials of the Tennessee State Mental Health Institute and the state Commissioner of Mental Health alleging deprivation of plaintiff's constitutional rights under the federal civil rights statute, 42 U.S.C. Sec. 1983, with various acts of negligence in failing to use due care in admitting her to the Institute, in assigning her to a hazardous floor of the institution and in failing to use due care in supervising plaintiff and other patients. Plaintiff alleged that, as a result, she was raped. The court dismissed the complaint and said, *inter alia:*

> These allegations alone convince the Court that the suit is based on simple negligence and does not state a claim of constitutional violations.

> We recognize many courts . . . allow negligence claims under 42 U.S.C. Sec. 1983. *However, this is done only under special circumstances.* The Seventh Circuit held in the case of *Spence v. Stares, [supra,]* [507 F.2d 554 (1974)] that a complaint stating more than an "isolated incident" of negligent supervision does not state a cause of action under Sec. 1983. In that case, the record showed that the defendant knew the decedent had been a target of at least twenty prior beatings at the institution he was confined in and knew that the decedent was non-verbal and unable to call for help or defend himself on attack.

> . . . We do not believe that the allegations in plaintiff's complaint rise to

the extreme level of neglect or deliberate inaction present in these kind of cases. 463 F.Supp. at pp. 809, 810.

In *Battle v. Anderson,* 376 F.Supp. 402 (E.D.Okla.1974), *aff'd,* 564 F.2d 388 (10th Cir. 1977), the District Court stated that while the Eighth Amendment does not have fixed, settled and definite limits, still "cruel and unusual punishment" exists if prisoners are maintained in a manner fairly characterized as foul, inhuman and violative of basic concepts of human decency.

The District Court did not address—nor was it urged by the parties to address—the question as to whether Flynn, in his official capacity as sheriff, was entitled to any "good faith" defense and instruction in a 42 U.S.C. Sec. 1983 action. See: *Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214* (1975); *Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90* (1974). Such question may involve the "discretionary function" rationale in determining the reasonableness of a public official's actions in the context of a Sec. 1983 action. *See: Smith v. United States, 375 F.2d 243* (5th Cir. 1967), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); *Smith v. Losee, 485 F.2d 334* (10th Cir. 1973).

### Other Contentions

We have considered the remaining contentions of error raised by appellant. If the contentions are valid, any errors are harmless. The challenged admission of Plaintiff's Exhibit 31, consisting of copies of the original records of Clappier's medical records during his hospitalization at Fitzsimmons Medical Center, completed on standard form "DA Form 2531–R–Medical Care" prepared in conjunction with attendant costs of care for third-party liability notification, was identified and testified to by one Kathleen Peterson. During Clappier's hospitalization, she served as Assistant Chief of Medical Records, Medical Division, Fitzsimmons Army Medical Center, in Denver. [R., Vol. VI, p. 262.] The exhibit was kept in the ordinary course of the hospital's business. It *was not* admitted for the purpose of establishing the reasonableness of the charges and the jury was so instructed.

[R., Vol. VI, p. 266.] Certainly, under these circumstances and in light of the substantial evidence of the nature of the injuries sustained, the pain and suffering incurred and the abuses practiced upon Clappier, the admission of Exhibit 31 with the Court's cautionary instruction was harmless. Furthermore, the court properly took judicial notice of a publication in the Federal Registry relating to hospital rates and charges concerning medical care furnished by the United States. [R., Vol. VI, pp. 266–268.] Exhibit 31 was likely admissible under Fed. Rules Evid.Rule 803(6), 28 U.S.C.A.

Under the circumstances reflected by this record and in light of the views expressed herein, we conclude that error occurred when the District Court awarded damages under both theories of liability and in instructing on the elements of the Sec. 1983 claim asserting that Flynn's inaction subjected Clappier to cruel and unusual punishment. Accordingly, the judgment is vacated and the cause is remanded for new trial consistent with the views expressed herein.