**Lucy QUEZADA, as personal representative of the ESTATE OF Berlinda Griego, deceased, Plaintiff–Appellee,**

v.

**The COUNTY OF BERNALILLO; Patrick Sauser; Alvin J. Campbell, Defendants–Appellants.**

No. 90–2014.

United States Court of Appeals,
Tenth Circuit.

Sept. 9, 1991.

Elizabeth E. Simpson, Tomita & Simpson, P.C. (Thomas R. Logan, of Tomita & Simpson, P.C., and John R. Tiwald, with her on the brief), Albuquerque, N.M., for plaintiff-appellee.

James M. Kennedy, Asst. Atty. Gen., Santa Fe, N.M., for defendants-appellants.

Before MOORE, ANDERSON and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

This case is about the shooting death of a woman by a sheriff's deputy and the efforts of her mother to recover damages under federal and state law. The lawsuit for this alleged wrongful death was tried in federal district court in New Mexico after the mother, Lucy Quezada (hereinafter Quezada or Plaintiff), filed a complaint on behalf of the estate of her daughter Berlinda Griego under one of the major federal civil rights laws, 42 U.S.C. § 1983, as well as New Mexico tort law. She was awarded over $1,240,000 in damages following a bench trial. The Defendants, including Bernalillo County, Sheriff Alvin Campbell and Deputy Sheriff Patrick Sauser (hereinafter Defendants), appeal. We affirm in part, reverse in part and remand.

## I. BACKGROUND

In the early hours of December 20, 1986, Berlinda Griego was the sole occupant of a car parked in a parking lot behind a building in Albuquerque, New Mexico. Deputy Sheriff Ramona Martin noticed the car in the lot and investigated after radioing dispatch. Deputy Martin parked in front of the car and saw Ms. Griego put her head down on the steering wheel. When Ms. Griego did not respond to her waving spotlight, Deputy Martin stepped out of her vehicle and up to Griego's car window and rapped on it several times. Ms. Griego reluctantly rolled her window down just a few inches but refused Martin's request to produce her driver's license, telling Martin "I'm not doing anything."

Deputy Sauser heard Martin's radio transmission and was the second officer to arrive at the scene. He also parked in front of Griego's car. Sauser joined Martin and together they tried to convince Griego to roll her window down more and respond. Griego, however, was not cooperating. She tried to roll her window up but was stopped when Deputy Martin put her flashlight in the window frame. The flashlight prevented the window from completely closing. Both deputies then saw Griego pick up a pistol. Deputy Sauser saw Griego load the weapon with a magazine containing bullets. Just before Griego picked up the gun a third sheriff's deputy, Brian Murphy, arrived. He also saw the gun and witnessed its loading.

In response to Griego's actions all three deputies drew their weapons. Deputies Martin and Murphy took cover. Deputy Sauser, on the other hand, moved only a few feet away from Griego's car. He stayed close and ordered Griego to put her gun down. Griego responded to Sauser's orders by saying, "Leave me alone, I want to kill myself." She placed the muzzle of the gun to her right temple. Then she started waving the weapon from the point of her right temple to her mouth. She also inserted the muzzle of the weapon inside her mouth.

At this point all the deputies realized Griego was suicidal. Deputy Sauser lowered his gun to a position behind his right leg. In addition, all the officers knew Griego was drinking. In fact, Deputy Sauser saw Griego lower her gun to take a drink of beer. Deputy Murphy also observed Griego drinking and Deputy Martin testified she smelled alcohol through the propped-open window of the car. At various times, all the deputies told Griego to drop her weapon and get out of the car. Deputy Sauser testified he asked Griego to step out of her car so he could talk with her about her problems.

Griego was still not cooperating when she put her car in gear and tried to slowly maneuver around the police cars and drive away. In response, Deputy Murphy moved his car, blocking the exit and trapping Griego in the parking lot. The deputies continued to tell Griego to drop the gun. Deputy Sauser testified Griego pointed her gun at him once before she tried to drive away. In response, he raised his weapon to a ready position and asked her to put the gun down. He described Griego's movements as "lackadaisical" and "aimless," and said she only pointed the gun in his "general direction."

Deputy Sauser positioned himself about five feet from Griego's car door after she stopped the car, picking a spot to stand where he thought Griego would not be able to see him. Various lights from the police vehicles were trained on Griego, in addition to the flashlight that was stuck in her window, and Deputy Sauser testified he thought it was difficult for Griego to see where he was standing. Griego's movements, according to Sauser, continued to be "aimless" until at one point she "turned abruptly, [and] aimed the weapon at me." Sauser said she "lowered her head and sighted," causing him to believe his life was in jeopardy. In response to this movement, Sauser fired three times. Two bullets struck Griego, mortally wounding her.

Both the other deputies observed the movement by Griego that prompted Deputy Sauser to shoot her. Deputy Murphy described it as a "movement toward Officer Sauser." Deputy Martin recalled that Griego "moved slightly forward in her seat, [and] turned her upper torso towards Officer Sauser's direction." Martin believed she yelled out a warning in response to Griego's actions.

After the shooting Griego was pulled from the car. Deputy Murphy remembered Griego saying "I can't believe you shot me." Deputy Martin likewise heard Griego speak and described her tone as one of "disbelief." Deputy Martin said Griego was struggling and trying to pull away when she was taken from the car, and Martin handcuffed her from the rear.

Deputy Murphy also remembered Griego struggling, but noted she "wasn't very strong at that time." Only seven minutes elapsed from the time of Martin's first radio report until an ambulance was called after the shooting.

## II. DISTRICT COURT PROCEEDINGS

Plaintiff sued Bernalillo County, Sheriff Campbell, and Deputy Sheriff Sauser on behalf of her deceased daughter. Plaintiff claimed Sauser violated her daughter's Fourth and Fourteenth Amendment rights by using excessive force. She further claimed Sheriff Campbell failed to train his deputies and accused the County of tolerating excessive force by its deputies. She alleged Sheriff Campbell and the County also violated the Fourth and Fourteenth Amendments. Her state law claim, in essence, charged all the Defendants with wrongful death due to negligence and assault, battery and abuse of process.

Following a trial without a jury the district court entered judgment for Plaintiff on her federal civil rights claim against Deputy Sauser, and against Deputy Sauser, Sheriff Campbell and Bernalillo County on her state wrongful death claim. The court awarded $1,243,876 in damages.

In its written fact findings, the district court said Deputy Sauser voluntarily and negligently placed himself in a position of peril where he had no choice other than to use deadly force. The court found Sauser's negligence was the proximate cause of Griego's death and found that, but for his negligence, deadly force would not have been required. Based on these findings the court concluded, as a matter of law, that Sauser violated Griego's Fourth and Fourteenth Amendment rights. It also ruled against Sauser under the New Mexico Tort Claims Act.

The court then ruled against Sheriff Campbell and Bernalillo County on Plaintiff's New Mexico claims. The court found Sheriff Campbell negligently trained deputies. It further found the County negligent under New Mexico Law for failing to institute policies and procedures to deal with potential suicides. However, the

**714**

court exonerated the County on Griego's federal claim, concluding the County was not deliberately indifferent in training employees. There was no mention in the court's conclusions of the federal claim against Sheriff Campbell.

## III. DISCUSSION

Defendants make six arguments on appeal. First, they argue the trial court erred in determining Deputy Sauser violated Griego's Fourth and Fourteenth Amendment rights. Second, they say Sheriff Campbell and Bernalillo County are not liable under the New Mexico Tort Claims Act because there was no waiver of sovereign immunity from suit. Third, they contend the district court did not apply the doctrine of comparative negligence. Fourth, they take issue with the New Mexico Tort Claims Act damages awarded Plaintiff. Fifth, they believe the district court erred in computing damages for the lost income and value of Ms. Griego's life. And finally, Defendants argue the trial court erred in awarding Plaintiff litigation costs including expert witness fees. We discuss each issue as necessary.

A. *Whether the District Court erred in concluding Deputy Sauser violated Ms. Griego's right to be free from excessive force under the Fourth and Fourteenth Amendments*

We begin by noting that Plaintiff brings her Fourth and Fourteenth Amendment claim against Deputy Sauser through 42 U.S.C. § 1983, the federal civil rights statute authorizing civil lawsuits to protect federal rights.[1]

■ A word is called for about the breadth of § 1983. The law creates no rights and is not a carte blanche statute authorizing recovery for negligence or other common law torts standing by themselves. Indeed, in order to recover in federal court through § 1983 a plaintiff must

show: (1) a federal constitutional right was violated; and (2) the individual violating the constitutional right did so under color of law. *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir.1981). The civil rights law is not a general tool to discipline local law enforcement officers. *Id.; Stringer v. Dilger*, 313 F.2d 536, 540 (10th Cir.1963). "Thus, we review this case not to determine whether the police officer may have committed an actionable tort against plaintiff, but rather to determine whether that conduct violated any of plaintiff's constitutional rights." *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir.1990). We are interested in whether the Sheriff's Deputy abused his "official power" by his allegedly negligent conduct. *Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1380 (10th Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). For purposes of § 1983, this is *not* an ordinary negligence case.

■ Defendants make a preliminary argument about the standard of review we apply in assessing the district court's factual findings. They contend we must review the § 1983 claim de novo by independently assessing the factual evidence. This standard of review would require us to make our own factual findings after reviewing the evidence. In support of this argument Defendants say the trial court's ruling implicates fundamental Fourth Amendment principles because it suggests "that the mere presence of a law enforcement officer may be constitutionally offensive." The Defendants then point to testimony and other evidence received during the trial and characterize it as supporting the idea that Deputy Sauser acted properly. For example, Defendants' brief describes the verbal requests of the deputies to get Ms. Griego to drop her gun and get out of her car as "pleas," "demands" and "cajoling." They characterize the requests in this fashion even though the deputies themselves did

1. The statute provides, in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to

 the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. § 1983.

not describe their actions in these terms when they testified. Nevertheless, we are asked to independently review the record and assign these descriptive terms to the deputies' behavior even though we did not see them testify.

Defendants also refer to physical evidence including photographs, the bullets, mathematical computations, and the medical examiner's records to establish Ms. Griego's position at the time she was shot. They contend this evidence demonstrates Ms. Griego was "leaning as if to draw a sight picture on Officer Sauser" so she could shoot him and that this "empirical data" supports the deputies' perceptions, and apparently, Deputy Sauser's actions. Defendants did not, however, designate any of this physical evidence as part of the record on appeal. Therefore, even assuming we had both the expertise and inclination to independently review this evidence to reach our own factual conclusions, we would not be able to do so.

While Defendants misunderstand the dimensions a plenary review of the evidence would encompass, the Plaintiff urges us to follow Rule 52(a) of the Federal Rules of Civil Procedure and review the district court's factual findings only for clear error. Rule 52(a) provides, in relevant part: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a).

Rule 52(a) requires us to accept the judge's factual findings unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). We are certainly not bound by Rule 52(a) when reviewing legal questions. *United States v. Singer Mfg. Co.*, 374 U.S. 174, 194–95 n. 9, 83 S.Ct. 1773, 1783–84 n. 9, 10 L.Ed.2d 823 (1963). However, whether the police used excessive force in a § 1983 case has always been seen as a factual inquiry best answered by the fact finder. *Street v. Parham*, 929 F.2d 537,

541 n. 2 (10th Cir.1991) (in excessive force cases the fact finder determines if the force used was excessive under the circumstances); *Trujillo v. Goodman*, 825 F.2d 1453, 1458–59 (10th Cir.1987) (question of excessive force is a factual inquiry properly reserved, in most instances, for the jury). *See also Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir.1991) (en banc) (question of whether force applied by police officers was reasonable is a jury question); *Pleasant v. Zamieski*, 895 F.2d 272, 275 (6th Cir.) (factual determinations of jury in § 1983 damages suit alleging excessive force reviewed for clear error), *cert. denied*, —— U.S. ——, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990); *Calamia v. City of New York*, 879 F.2d 1025, 1035 (2d Cir. 1989) (jury determines whether police officer conduct is objectively reasonable); *Fitzgerald v. McDaniel*, 833 F.2d 1516, 1518–19 (11th Cir.1987) (same).

Defendants offer no persuasive reason for deviating from our normal standard of review in this case. On the other hand, the policy behind Rule 52 strongly supports the clear error standard. According to the federal rules advisory committee, there is a "public interest in the stability and judicial economy that [is] promoted by recognizing that the trial court, not the appellate tribunal, should be the finder of the facts." Fed.R.Civ.P. 52 advisory committee's note (1985 Amendment). "To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority." *Id.*

Defendants base their argument for de novo review by referring us to First Amendment defamation cases where the Supreme Court abandoned Rule 52(a)'s "clearly erroneous" standard in favor of a more searching inquiry. *See, e.g., Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 514, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984). According to the Court, a less deferential standard of appellate review is necessary in certain First Amendment cases because experience has

proven that "[p]roviding triers of fact with a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served ... to eliminate the danger that decisions by triers of fact may inhibit the expression of protected ideas." *Id.* at 505, 104 S.Ct. at 1962. The principle that there is no such thing as a false idea demands a heightened examination of trial court findings. However, the Plaintiff's case before us is not grounded on the First Amendment; rather, Plaintiff alleged a Fourth Amendment violation. Thus, Defendants' First Amendment argument does not apply here.

Defendants offer no other reason why a heightened standard of review is necessary. As noted, this matter is not based on the First Amendment. Nor does it fall into any other class of constitutional cases where heightened appellate review is imperative in order to prevent the complete frustration of a constitutional right. *See, e.g., Cox v. Louisiana,* 379 U.S. 536, 545 n. 8, 85 S.Ct. 453, 459 n. 8, 13 L.Ed.2d 471 (1965) (independent factual review necessary in freedom of speech cases involving a civil rights demonstrator); *Norris v. Alabama,* 294 U.S. 587, 589–90, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935) (independent factual review required where right to fair trial denied when blacks were intentionally excluded from jury service in a state court which was trying a black defendant).[2]

While we see no reason to deviate from the clearly erroneous standard of review regarding the district court's factual findings, we do recognize that "[w]hen an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings." *Pullman–Standard v. Swint,* 456 U.S. 273, 291, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982). This aspect of our review is important in this case because—as will be seen—there have been significant developments in

Fourth Amendment excessive force jurisprudence since the district court made its original factual findings.

In 1989 the Supreme Court decided *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and directed lower courts to analyze constitutional claims of excessive force by applying Fourth Amendment standards of objective reasonableness. *Id.* at 395, 109 S.Ct. at 1871. In adopting this standard, the Court overruled lower court decisions that evaluated excessive force claims based, in part, on subjective concepts like " 'malice' " or " 'sadism.' " *Id.* at 399, 109 S.Ct. at 1873. *See, e.g., Trujillo,* 825 F.2d at 1458; *Hewitt,* 758 F.2d at 1379.

The objective standard now in effect requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1871. In addition, the Court says:

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," ... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. at 1872 (citations omitted). In summary, "the 'reasonableness' inquiry in an excessive force case is

---

**2.** For a discussion on when the Supreme Court reviews questions of constitutional fact, see P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, *Hart & Wechsler's The Federal Courts and The*

*Federal System* 661–73 (3d ed. 1988); Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229 (1985).

an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. at 1872.

The parties in this case agree that *Graham* governs, even though *Graham* had not been decided at the time Plaintiff's case was tried. In acknowledging the *Graham* standard, Defendants argue Deputy Sauser's actions were objectively reasonable. After reviewing the record and factual findings, we are unable to reach this conclusion. On the other hand, it is equally inappropriate for us to affirm district court findings that are premised on an incorrect legal standard. *Swint,* 456 U.S. at 291, 102 S.Ct. at 1791–92.

The district court's factual findings as they now stand are lacking because they do not address *Graham's* objective factors. *See Graham,* 490 U.S. at 396–97, 109 S.Ct. at 1871–72. In particular, there is no recognition or assessment of the split-second judgments the deputies were making as they were on the scene. Nor is there any consideration of the possibility that Ms. Griego was committing a crime when the officers approached her. The findings also do not factor in the danger Ms. Griego posed to herself or others, including the deputies.

More importantly, the district court did not determine if Deputy Sauser's actions were objectively unreasonable. While there is no doubt the district court found Deputy Sauser negligent, our review of the findings convinces us the district court's factual findings only specifically dealt with Plaintiff's state law negligence claim. For example, Deputy Sauser's actions—including his raising and lowering of his gun and his failure to take cover—are not analyzed for objective reasonableness. Similar omissions exist regarding the other deputies. We therefore believe, in light of *Graham,* that the district court did not fully and properly consider whether the deputies' actions were objectively unreasonable in violation of Ms. Griego's constitutional rights.

We empathize with the parties and the district court because they did not have *Graham* as guidance when this action was tried. Nevertheless, the need to make proper findings under the *Graham* standard cannot be gainsaid. Furthermore, as already discussed, it is inappropriate for us to examine the appellate record in an attempt to extrapolate new findings, and we will not second guess about what additional evidence may be necessary in light of *Graham.* Our holding is appropriately a limited one. We hold the district court's factual findings are clearly erroneous on the § 1983 claim because the district court did not assess the evidence for objective reasonableness as articulated by *Graham.* The judgment for Plaintiff on this claim is set aside. The cause will be remanded to the district court for such further proceedings as it deems necessary for the making of revised findings and conclusions of law on the § 1983 claim. In so holding, we stress that additional findings are required because of the intervening *Graham* decision, and because without thorough factual findings regarding a constitutional claim there is a danger that liability for ordinary negligence under state law will improperly be transformed into a judgment that federal constitutional rights were also violated. Since this matter was not originally tried to a jury, we will not automatically order a new trial, although the district court is free to order a new trial if it believes it is appropriate to do so.

Finally, one other matter must be briefly addressed before turning to the remaining issues on appeal. In urging the outright reversal of Plaintiff's § 1983 judgment, Defendants assert they are entitled to a "good faith" defense. In making this argument, Defendants go on to say they are entitled to "good faith immunity as a matter of law."

This argument concerning a "good faith" defense is misplaced given the governing *Graham* standard of assessing police conduct for objective reasonableness. Whether Deputy Sauser acted with subjective good faith is irrelevant.

■ Alternatively, when Defendants comment that they are entitled to "good faith immunity as a matter of law" they may be asserting a defense of qualified immunity from suit. Qualified immunity has been referred to as " 'good faith' immunity." *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982). Qualified immunity is a recognized legal doctrine that protects government officers from having to defend themselves from baseless lawsuits. *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 645 (10th Cir.1988). "The doctrine of qualified immunity provides that government officials 'generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Rozek v. Topolnicki*, 865 F.2d 1154, 1157 (10th Cir.1989) (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738).

■ Defendants must raise the qualified immunity defense in order to benefit from the substantial shield it affords. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736–37. Defendants may do this in their answer, or in a motion to dismiss or a motion for summary judgment. *Losavio*, 847 F.2d at 646. Defendants who are unsuccessful in having a lawsuit dismissed on qualified immunity grounds before trial may reassert the defense at trial or after trial. *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir.1991). *See, e.g., Melton v. City of Oklahoma City*, 879 F.2d 706, 727 n. 33 (10th Cir.1989) (listing methods by which qualified immunity defense may be preserved and then argued on appeal). But in order to benefit from the defense Defendants *must* raise it. *Poe v. Haydon*, 853 F.2d 418, 424 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989).

■ Because Defendants' Answer was not designated as part of the record on appeal, we are unable to determine whether they waived the qualified immunity defense in this matter. However, as a practical matter, regardless of whether it was properly pled, the qualified immunity defense in excessive force cases is of limited value. While qualified immunity is a powerful defense in other contexts, in excessive force cases the substantive inquiry that decides whether the force exerted by police was so excessive that it violated the Fourth Amendment is the same inquiry that decides whether the qualified immunity defense is available to the government actor. *See, e.g., Dixon*, 922 F.2d at 1463. Police use of excessive force is an established constitutional violation, *Tennessee v. Garner*, 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1985), and in an excessive force case, the factfinder determines if the police officer is liable by deciding if the force he used was objectively unreasonable. *Graham* 490 U.S. at 399, 109 S.Ct. at 1873; *Street*, 929 F.2d at 541 n. 2. Likewise, a government official may not defend based on qualified immunity if it is decided that no reasonable government official acting in the same place and under the same circumstances would have believed his actions were legal. *Rozek*, 865 F.2d at 1157.[3] Thus, given this focus on reasonableness, the Defendants—at least in this case where the district court did not feel things were so one sided that it decided the case early on as a matter of law—do not suffer if they failed to plead qualified immunity.

**B.** *Liability of Sheriff Campbell under the New Mexico Tort Claims Act and Liability of Bernalillo County under the Doctrine of Respondeat Superior*

The district court found Sheriff Campbell negligent for failing to properly train and supervise Deputy Sauser and further found Sheriff Campbell's failure was a proximate cause of Ms. Griego's death. The court then concluded Sheriff Campbell is liable to Plaintiff under the New Mexico Tort Claims Act for negligence in failing to

---

**3.** There are, however, instances when police officers successfully invoke qualified immunity. For example, a police officer who executes an illegal search warrant issued by a magistrate escapes liability if it is decided that no reasonable police officer would have known the warrant was illegal. *Street*, 929 F.2d at 541 n. 2; *Dixon*, 922 F.2d at 1463.

properly train and supervise Deputy Sauser. Bernalillo County was likewise held liable by the district court under the doctrine of *respondeat superior* for Sheriff Campbell's and Deputy Sauser's negligence. Bernalillo County was also held liable for its own negligence in failing to institute policies and procedures to deal with potential suicides.

Defendants challenge the district court's decisions regarding Sheriff Campbell and Bernalillo County. First, Defendants argue there is no liability under the New Mexico Tort Claims Act ("the Tort Claims Act" or "Act") because the Act does not waive sovereign immunity for wrongful death resulting from failure to train or to institute policies. Second, Defendants allege there is no evidence that Ms. Griego was suicidal. Defendants then reason it is inappropriate to hold Sheriff Campbell and Bernalillo County liable for failing to teach deputies or institute policies on how to deal with suicidal persons in a case where there is no evidence the deceased was suicidal. They also allege Bernalillo County cannot be held liable for failing to train or institute policies under the doctrine of *respondeat superior*. Having summarized the arguments, we now consider them.

We first review applicable provisions of the New Mexico Tort Claims Act to address Defendants' argument that Sheriff Campbell is not liable under the Act. The Act, which limits sovereign immunity in New Mexico, reads in pertinent part: "[I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act [41–4–1 to 41–4–27 NMSA 1978] and in accordance with the principles established in that act." N.M.Stat.Ann. § 41–4–2(A) (1989 Repl. Pamp.). The statutory waiver for law enforcement officers provides:

The immunity granted pursuant to Subsection A of Section 41–4–4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M.Stat.Ann. § 41–4–12 (1989 Repl. Pamp.).

■ Defendants say the statute waiving ·sovereign immunity for law enforcement officers for wrongful death resulting from assault or battery cannot be read to include liability for the separate tort of failure to train and properly supervise. Thus, Defendants contend the district court erred by holding Sheriff Campbell liable to Plaintiff for failing to train Deputy Sauser regarding potential suicides.

Defendants' argument was recently squarely rejected by the New Mexico Court of Appeals in *Ortiz v. New Mexico State Police*, 814 P.2d 117 (N.M.Ct.App.1991). The court considered whether the New Mexico Tort Claims Act provides immunity to law enforcement officers whose negligent supervision and training of subordinates proximately causes the commission of the torts of assault, battery, false arrest, and malicious prosecution by their subordinates. *Id.* at 118. In construing the Act, the court said sovereign immunity is waived when "the law enforcement officer, while acting within the scope of duty, negligently or intentionally causes the commission of a listed tort by another person." *Id.* Only the New Mexico Supreme Court or legislature can overrule the New Mexico Court of Appeals' reading of state law. Until that happens, we are bound by this interpretation of the state Tort Claims Act.[4] Accordingly, the district court did not err in holding Sheriff Campbell liable under the Act for negligence stemming

---

4. We note the New Mexico Supreme Court granted certiorari in *Ortiz* on May 2, 1991. *See* 814 P.2d at 118.

from his failure to train or supervise Deputy Sauser.[5]

We now consider whether Bernalillo County is liable under New Mexico law. Defendants argue Bernalillo County is not liable under the doctrine of *respondeat superior*. We do not agree. In New Mexico, "[a] governmental entity is not immune from liability for any tort of its employee acting within the course of duties for which immunity is waived." *Silva v. New Mexico*, 106 N.M. 472, 477, 745 P.2d 380, 385 (1987). Given that we are constrained to hold that Sheriff Campbell is not immune from liability for negligently failing to train or supervise his employees, it follows that Bernalillo County is also not immune under New Mexico's doctrine of *respondeat superior*. In *Silva*, the New Mexico Supreme Court declared "[w]hen the act of the employee is the act of the public entity, let the master answer." *Id.* Because New Mexico law on *respondeat superior* is clear, we find no error in the district court's conclusion holding Bernalillo County liable under the doctrine.[6]

We also take exception to Defendants' contention suggesting there is an "absence of evidence" that Ms. Griego was suicidal.

The district court noted Deputy Sauser heard Ms. Griego say " 'leave me alone—I want to kill myself.' " In addition, the district court wrote Deputy Sauser saw Ms. Griego raise the gun she was holding to her head. He also saw her insert the muzzle of the gun into her mouth. The district court also described how one of the paramedics who treated Ms. Griego after she was shot heard her say, " 'I just want to die.—let me die.' " We therefore cannot agree with Defendants that Ms. Griego was not suicidal. The district court's findings are sufficiently clear on this point. Given New Mexico law, the district court did not err in holding Bernalillo County liable via the doctrine of *respondeat superior* for Sheriff Campbell's negligent failure to train and supervise deputies on how to deal with potential suicides. *See Ortiz*, 814 P.2d at 118.

Even if we were able to hold the county may not be sued for Sheriff Campbell's alleged negligence, the county would still be liable for Deputy Sauser's negligence. In New Mexico, the doctrine of *respondeat superior* is not limited to imposing vicarious liability on an employee's immediate supervisor. According to the

---

**5.** Defendants make an alternative argument which relies on the New Mexico waiver of sovereign immunity for law enforcement officers who deprive individuals of rights, privileges or immunities secured by the United States or New Mexico constitutions and laws. *See* N.M.Stat. Ann. § 41–4–12 (1989 Repl.Pamp.). Defendants say because no constitutional violation occurred in this case neither Sheriff Campbell or Bernalillo County are liable under this part of the Tort Claims Act.

Given the controlling New Mexico Court of Appeals holding that the Tort Claims Act covers the tort of negligent supervision or training of a subordinate who commits a battery, we need not consider Defendants' alternative argument. However, for purposes of clarification, we note that we read the district court's findings in this case as indicating Deputy Sauser committed a battery on Ms. Griego. The fact that Deputy Sauser did not subjectively intend to harm Ms. Griego is immaterial because under New Mexico law if " 'the basis of an action is assault and battery, the intention with which the injury was done is immaterial * * * provided the [intentional] act causing the injury was wrongful * * *.' " *California First Bank v. New Mexico*, 111 N.M. 64, 74 n. 6, 801 P.2d 646, 656 n. 6

(1990) (quoting *Keel v. Hainline*, 331 P.2d 397, 399 (Okla.1958)). The district court findings indicate Deputy Sauser's actions were negligent, and therefore wrongful. Thus, Deputy Sauser's actions qualify as a battery for purposes of the Tort Claims Act. *See* N.M.Stat.Ann. § 41–4–12 (1989 Repl.Pamp.). Since the Act, as currently interpreted, makes supervisors liable for the batteries of their subordinates when supervisors negligently fail to train or supervise their subordinates, Sheriff Campbell cannot claim he is immune from suit. *See Ortiz*, 814 P.2d at 118.

**6.** Although the argument is mixed in with their other points, Defendants further complain about the district court's holding that Bernalillo County is directly liable to Plaintiff under the state Tort Claims Act for failing to institute policies and procedures to deal with potential suicides. However, since the district court used *respondeat superior* as a basis for holding Bernalillo County liable, we will not discuss whether the county is directly liable to Plaintiff under the Tort Claims Act. If the district court on remand separately apportions damages based on the county's direct liability to Plaintiff, the Defendants are free to more directly challenge the district court's legal conclusions and actions on this point in a future appeal.

New Mexico Supreme Court, "[a]dherence to a principle of 'direct supervision' should never be used to defeat totally a claim which otherwise has been brought under traditional concepts of *respondeat superior.*" *Silva,* 106 N.M. at 477, 745 P.2d at 385. While some supervisors may be too "remote" to be liable under *respondeat superior,* the New Mexico rule is that courts must be constrained in using remoteness as a reason for defeating *respondeat superior* liability. *Id.* Given this policy, the county is subject to suit for Deputy Sauser's actions regardless of whether it also is subject to suit for Sheriff Campbell's actions. *See also California First Bank,* 111 N.M. at 70–71, 801 P.2d at 652–53 (county may be vicariously liable for failure to train, supervise or discipline sheriff deputy's when the deputy's fail to enforce liquor control laws).

C. *The District Court finding that Deputy Sauser was the sole cause of Ms. Griego's death*

■ Defendants take issue with the district court's factual finding that Deputy Sauser was the proximate cause of Ms. Griego's death. Defendants contend the district court did not consider Ms. Griego's own negligence and did not apply the doctrine of comparative negligence. The parties agree our standard of review is for clear error. Fed.R.Civ.P. 52(a). We consider Defendants argument only insofar as it applies to the district court's state law rulings. Comparative negligence is not applied in suits for violations of federal constitutional rights under § 1983. *Clappier v. Flynn,* 605 F.2d 519, 530 (10th Cir.1979) (§ 1983 does not allow comparison of fault between the plaintiff and defendant).

New Mexico follows the doctrine of "pure" comparative negligence. *Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234 (1981). This doctrine requires parties "to share the losses caused, at the ratio of their respective wrongdoing." *Scott,* 96 N.M. at 689, 634 P.2d at 1241.

■ A summary of all the relevant findings reveals the district court found Deputy Sauser placed himself in a position of great jeopardy by standing in the open and close to Ms. Griego's car. Deputy Sauser disregarded his own safety by standing where he did. His actions left absolutely no room for error and forced the deadly confrontation because—given his vulnerable location—Deputy Sauser's only available option was deadly force. But for this negligence, deadly force would not have been required.

■ When reviewing factual findings for clear error an appeals court does not retry the case to determine whether the trial court made the correct decision. Our concern is whether the trial court reached a permissible decision in light of the evidence. *EEOC v. General Lines, Inc.,* 865 F.2d 1555, 1558 (10th Cir.1989). An appeals court is not entitled to reverse the findings of the trier of fact even if convinced it would have decided the case differently had it been the trier of fact. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The resolution of conflicting evidence and credibility determinations are for the trial judge who personally hears the evidence and observes the demeanor of the witnesses. *Dowell v. United States,* 553 F.2d 1233, 1235 (10th Cir. 1977).

After reviewing the transcript, we do not believe the district court's view of the evidence is clearly erroneous. The record reveals all the deputies, except Deputy Sauser, took cover once Ms. Griego's weapon was spotted. The available cover included a nearby dumpster and three parked police cars. Although it probably was not the safest place, at one point one of the deputies even crouched down and hid along the passenger side of Ms. Griego's car. Deputy Sauser testified he realized Ms. Griego was suicidal. He also saw her drinking beer. At one point before the shooting he raised his gun to a position where he was ready to fire because he thought Ms. Griego was pointing her gun at him. In spite of this near confrontation before the shooting, Deputy Sauser stayed close to Ms. Griego's car and estimated he was only five feet away from it. Deputy Sauser testified he was not aware of any department policy

on how to handle a suicidal person with a deadly weapon. However, one of the other deputies testified that when dealing with a potential suicide the proper procedure is to secure the scene and then try and talk to the individual. A training officer for Bernalillo County testified that in certain situations it is not sound to approach a suicidal person, although he further stressed that cases must be handled on an individual basis. The training officer suggested one proper tactical approach for dealing with a suicidal person in a vehicle is to use any available cover and attempt to establish verbal communication before approaching the vehicle. He said the department recommends using cover when dealing with an armed suspect who presents a clear and present danger. Given all this testimony, much of which comes from Deputy Sauser himself, we cannot say the district court's factual findings are unsupported and clearly erroneous.

Furthermore, we believe, unlike Defendants, that the district court at least implicitly considered Ms. Griego's actions for purposes of comparative negligence. In its findings the district court recognized how Deputy Sauser saw Ms. Griego wave her gun and put the gun in her mouth and to her temple. The court also mentioned Ms. Griego was drinking. Thus, the district court obviously knew what Ms. Griego was doing but discounted her actions when it found "Defendant Sauser placed himself in a position of great jeopardy, thereby solely creating the danger." We observe Defendants in their brief even expressly admit Deputy Sauser breached the duty he owed to Ms. Griego because he "amplified the risk of harm to Ms. Griego" when he approached her vehicle.

Only one specific factual finding is unsupported by the evidence. In Finding No. 15, the district court wrote Plaintiff's expert believed Ms. Griego was behaving ambivalently on the night she was killed. On the contrary, the expert testified Ms. Griego's behavior on the night she died was risky and a terrible lapse in judgment. Because this finding is contrary to the evidence it must be set aside. However, we are convinced the district court's remaining findings are permissible in light of the evidence.

Defendants argue Ms. Griego could not conduct herself as she did and then escape some measure of liability. They submit Ms. Griego is the one who set in motion the forces that ultimately led to her death and that she was the proximate cause of her own injuries. Although we might have accepted this plausible theory had we been the trier of fact, we cannot reverse the district court for this reason alone. As we have said, our job is not to retry the case. We hold the district court's findings are not clearly erroneous in light of all the evidence in this case.

D. *Apportionment of Damages under § 1983 and the New Mexico Tort Claims Act and Computation of Damages for Lost Income and Loss of Life*

 Plaintiff was awarded $1,243,876 for her daughter's death. In making the award, the district court considered the following about Ms. Griego: the value of lost earning; the loss of household services; and the value for loss of life. The court reduced the award for lost earnings because it found Ms. Griego—had she lived—would have required treatment and would have been unable to work during her treatment period.

Because we are setting aside the § 1983 judgment and remanding for further proceedings, it follows that the § 1983 damages award must also be set aside. We are unable to tell how much the district court awarded on the § 1983 claim versus how much it awarded on the state law claim. The entire damages awarded must therefore be vacated.[7] On remand, the district court will have the opportunity to properly

---

7. The district court's damages award states:
 Plaintiff is entitled to judgment against Defendants as follows:

| | |
|---|---:|
| Present value of loss of earning capacity | $ 306,458.00 |
| Loss of household services | 39,044.00 |
| Value of loss of life | 919,374.00 |
| Less loss of earnings during period of treatment | −21,000.00 |
| TOTAL | $1,243,876.00 |

apportion damages. We are unwilling to guess about the damages award as it currently stands, and we will not assume the district court awarded Plaintiff the New Mexico statutory maximum of $300,000 on her state law claim, and then assigned the rest of the award to her § 1983 federal claim.[8] We further believe apportionment of damages will eliminate any fear of double recovery, which is impermissible, and will help answer any questions which may develop concerning post-judgment interest. *See, e.g., Clappier,* 605 F.2d at 528–30 (§ 1983 provides a remedy which is supplemental to state remedies, but double recovery is not permitted); *Wells v. County of Valencia,* 98 N.M. 3, 644 P.2d 517 (1982) (same). In addition, because the entire damages award is set aside, the district court on remand may consider Defendants separate arguments that it overvalued the lost earning capacity and loss of life damages for Ms. Griego. Depending on how this case develops on remand with respect to the § 1983 claim, the district court may respond to Defendants' arguments in detail with appropriate findings and conclusions.

### E. *Award of Costs*

 Finally, Defendants object to the district court's awarding of various costs—including expert witness fees—to Plaintiff. The Supreme Court recently decided *West Virginia Univ. Hosps., Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). The *Casey* Court concluded the award of expert witness fees is governed exclusively by 28 U.S.C. §§ 1821 and 1920. *Id.* 111 S.Ct. at 1148. *Casey* was decided while this appeal was pending and Plaintiff concedes the decision impacts the district court's expert witness fee award in this case. We accordingly vacate the district court's award of costs, which includes expert witness fees, and remand for further consideration in light of *Casey.* So long as

it conforms with *Casey,* the district court may use its sound discretion to award costs. *See, e.g., Howell Petroleum Corp. v. Samson Resources Co.,* 903 F.2d 778, 783 (10th Cir.1990) (district court has discretion under Fed.R.Civ.P. 54(d) to award costs to party which is only partially successful); *Roberts v. Madigan,* 921 F.2d 1047, 1058 (10th Cir.1990) (upholding costs award to the party that prevailed on the vast majority of the claims and the central claims at issue), *petition for cert. filed* 3/15/91 (S.Ct. No. 90–1448).

### IV. CONCLUSION

We AFFIRM the district court's finding that Deputy Sheriff Sauser was negligent. We also AFFIRM the judgment against Sheriff Campbell and Bernalillo County on Plaintiff's New Mexico claim. However, because we believe the district court did not make sufficient factual findings or conclusions of law concerning Plaintiff's § 1983 claim, we REVERSE the judgment on the § 1983 claim and REMAND for further proceedings. In light of our action on the § 1983 claim, the district court's award of damages and costs to Plaintiff is VACATED and REMANDED for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

---

**8.** The New Mexico Tort Claims Act specifies:
A. In any action for damages against a governmental entity or a public employee while acting within the scope of his duties as provided in the Tort Claims Act [41–4–1 to 41–4–27 § 1 NMSA 1978], the liability shall not exceed:
. . . .

(2) the sum of three hundred thousand dollars ($300,000) to any person for any number of claims arising out of a single occurrence for all damages other than property damage as permitted under the Tort Claims Act[.] N.M.Stat.Ann. § 41–4–19(A)(2) (1989 Repl. Pamp.).